## McGEHEE v. LINDSAY.

1. An act of the Legislature was passed, providing for the improvement of the navigation of a river, and under its direction, three commissioners were elected, who were required to cause estimates of the work to be made, and adopt the cheapest and most practicable plan for its completion, by letting the same to contract, in divisions, &c. to the lowest responsible bidder. To insure faithfulness on the part of the commissioners, they were required to take an oath to discharge their duties to the best of their skill and ability ; one of them took an interest in a contract, which the board let, for doing the entire work, and brought an action against one of the several contractors, to recover his proportion of the money which the defendant had received : *Held*, that the agreement, by which the commissioner was let into the participation of an interest in the contract, was against public policy, a fraud on the State, and could not be enforced.

WRIT of Error to the County Court of Benton.

The defendant in error declared against the plaintiff, in assumpsit for money had and received, paid, laid out and expended, as well as for money lent and advanced. The cause was tried upon the general issue, with leave to give any special matters in evidence that might be pleaded in bar. On the trial the defendant excepted to the ruling of the court. From the bill of exceptions, it appears that the plaintiff proved by a witness, that he (plaintiff) had an obligation on the defendant for the payment of a sum of money, which was delivered by plaintiff's wife, by his directions, to one Brasher, who carried it to the defendant's house; but not finding him at home, Brasher handed him the paper shortly afterwards, upon meeting him in the road. After some conversation, defendant tore up the paper, requesting the witness to tell the plaintiff his money was ready for him. This occurred in January, 1840. Brasher also had an obligation for the payment of money made by the defendant; but neither that or the one held by the plaintiff, was read to or by the witness. The plaintiff, Brasher and Henry Looney, were commissioners elected by the legislature to contract for the improvement of the navigation of the Coosa river,

under the acts of the 19th December, 1837, and the 1st February, 1839.

The plaintiff introduced another witness, who stated that on the 4th of July, 1839, the commissioners, pursuant to previous notice, let the contract for the improvement of the navigation of the Coosa. The plaintiff was chairman of the board, and the defendant, together with Wm. H. Moore, Wm. Hogan, Benjamin F. Powell and Jacob T. Bradford, composed a company who bid off the contract at $54,650. Witness and Hogan wrote and put in the bids for the company, which ranged from $40,000 to near $60,000; witness' bid being $50,000, was forfeited, and the work undertaken at the price stated above, which was the next lowest responsible bid, and a bond for its completion executed by Wm. McGehee & Co. Besides the bids of the company, there were many others for different sections of the work, and one which proposed to undertake the entire work, as well as witness recollects, for $55,500. Witness thinks that plaintiff, before the contract was made, gave him to understand that he was to be, and must be interested in it. This understanding was derived from the plaintiff in various conversations; and witness knows that the matter of the plaintiff's being interested in the contract, was fully discussed by the company.

A few days after the contract was made, the members of the company met at the defendant's house, and entered into articles of agreement, defining their name, style, &c. In the company there were eight shares, of which the defendant represented three, Powell two, John Looney one, Bradford one, and Moore one; of the three shares represented by the defendant, the plaintiff was to have one and Brasher another. Brasher did not attend the meeting at the defendant's house, but the plaintiff was present and understood, and agreed to the arrangement of the shares, and was to have an equal share of all the profits. The defendant was the treasurer of the company, and while acting in that character, he received a check from the plaintiff, as chairman of the commissioners, on which he received and retained the money for the prosecution of the work.

In January, 1840, the witness understood from Powell, the then treasurer, that he had on each of the shares ready to be paid over, the sum of one thousand dollars, besides enough money to

3

continue the work until another check could be obtained. Witness received one thousand dollars, which he immediately paid over to Bradford, but did not see any other member of the company receive money from the treasurer; nor did he ever hear plaintiff make any claim on the defendant, or know of his having any except such as was founded on the transactions above stated.

On this evidence the court charged the jury, that if after the contract was made, the defendant, or company, let the plaintiff have a share therein, and money was received, either by the defendant or the company, the plantiff might maintain his action to rever the amount so received for him against the persons who had it. *Further*, that if there was a partnership between the plaintiff and defendant, and no settlement of their accounts had taken place, the former was not entitled to recover. The defendant then prayed the court to charge the jury as follows: 1. If they believed all the evidence adduced to be true, they must find for the defendant. 2. If they believed that the plaintiff had shown no claim on defendant except such as is founded on some agreement and understanding, had and entered into by the plaintiff, as a commissioner appointed by the legislature, they must find for the defendant. Both of which charges were refused; the jury returned a verdict for the plaintiff, for the sum of one thousand dollars, and a judgment was rendered accordingly.

S. F. RICE, for the plaintiff in error.—The proof very clearly shows that the plaintiff below was interested with the defendant and others, in the contract which was made for the improvement of the navigation of the Coosa. The agency which he had as one of the commissioners of the State in making the contract, utterly disqualified him from undertaking its performance himself, or from being concerned, either directly or indirectly, with others. [9 Porter's Rep. 40, 68; 1 Ala. Rep. 34, 622; 4 Yeates' Rep. 84; 1 Caine's Rep. 104; 5 Mass. Rep. 385, 541; 4 Id. 370; 11 Wheat. Rep. 258; 8 Johns. Rep. 444; 6 Id. 194.] The duties of the plaintiff as a commissioner, did not cease when the contract was made, but he was to supervise its completion. Both the first and the second charges should have been given. [See 5 Mass. Rep. 541, and Pamphlet Acts of Legislature of 1837, p. 13; Acts of 1838, p. 62.]

W. B. MARTIN, for the defendant.—The facts do not show that the plaintiff participated in a contract which, as to him, was against policy, and which his relation to the public forbid him from entering into; and there is, consequently, no error, either in the charges given to the jury, or in those refused. [2 A. K. Marsh. Rep. 542; 7 Taunt. Rep. 246; 11 Serg't & R. Rep. 164; 13 Serg't & R. Rep. 29; 4 Mass. Rep. 370; 8 Id. 385; 2 Bing. Rep. 242; Chit. on Con. 216–7; 3 Term Rep. 418; 1 Monr. Rep. 199; 3 Am. Com. L. Cases, 361.]

COLLIER, C. J.—By the act of the 19th of December, 1837, it was provided that a board of commissioners to consist of three persons, should be elected, to be designated the board of Coosa river commissioners; who should, before entering upon the discharge of their duties, take and subscribe an oath, faithfully to discharge the duties of their office to the best of their skill and ability. The board were authorised to choose one of their number president, &c., to appoint agents, &c., with such compensation as they might consider just and reasonable; and for their services the commissioners were to receive the sum of four dollars per day. They were also vested with power to cause a survey to be made by an engineer, &c. of the Coosa, and an estimate of the probable cost of the removal of the impediments which obstruct its navigation for flat or keel boats descending at a low stage of water, from the head of the ten islands to the foot of the falls at the town of Wetumpka. *Further*, they were authorised to adopt the cheapest and most practicable plan of removing obstructions between the points mentioned, by letting the same to contract, in divisions or sections, to the lowest responsible bidder, after having given thirty days notice in the papers of Mobile, &c. This statute appropriated the sum of thirty thousand dollars for the purpose of carrying into effect the object of its enactment.— The subsequent act of the 1st of February, 1839, appropriated the further sum of thirty thousand dollars for the same purpose; both acts authorise the President of the Board to draw checks on the Cashier of the Bank of the State, in favor of any person to whom money may be due for work done, or service rendered under a contract with the board.

The question in this case is, can the president of the board of commissioners, elected by the legislature, and acting under the

authority of the statutes cited, associate himself with others, and make a contract with the board for the completion of the work, which they were authorised to let out and supervise? It may be laid down generally, that agents cannot at the same time take upon themselves incompatible duties and characters; or become actors in a transaction in which they have an adverse interest or employment. [Story's Ag. 11, 31–2.] This rule is founded upon the plain and obvious consideration, that the principal bargains for the exercise of the disinterested skill, diligence, and zeal of the agent for his exclusive benefit, in the business about which he is employed. "It is a confidence," says Mr Justice Story, "necessarily reposed in the agent, that he will act with a sole regard to the interest of his principal, as far as he lawfully may." Further, "it may be said with reference to christian morals, that no man can faithfully serve two masters, whose interests are in conflict. If then, the seller were permitted as the agent of another, to become the purchaser, his duty to his principal and his own interest, would stand in direct opposition to each other; and thus a temptation, perhaps in many cases, too strong for resistance by men of flexible morals, or hacknied in the common devices of worldly business, would be held out, which would betray them into gross misconduct, and even crime. It is to interpose a preventive check against such temptations and seductions, that a positive prohibition has been found to be the soundest policy, encouraged by the purest christianity." [Story's Ag. 199, 200.] So unyielding is the rule of law upon this point, that the inquiry is never permitted; whether the agent who has placed himself in an antagonistic position, has derived a profit from the bargain: Whether he has or not, it is equally without obligation to bind his principal. And whether he be a sole agent, or united with others, is alike unimportant. [Id. 201–2.]

It is insisted that the plaintiff is not entitled to recover, because the agreement between himself and the company, for an interest in the contract made by the lattter with the commissioners to remove obstructions to the navigation of the Coosa, was against public policy. There can be no question at the present day, that a contract opposed to the policy of the State is void, and will not be enforced by a court of justice. [Chitty on Con. 519, 4 Am. ed. and cases there cited; Carrington vs. Caller, 2 Stew't Rep. 175, and cases cited in my opinion, commencing at page 590;

Mitchell vs. Reynolds, 1 P. Wms. Rep. 181; Hunt vs. Knickerbocker, 5 Johns. Rep. 327; Wheeler vs. Russell, 17 Mass. Rep. 258; Patton vs. Nicholson, 3 Wheat. Rep. 204; Smith vs. Statesbury, 2 Burr. Rep. 924; Sanches vs. Davenport, 6 Mass. Rep. 261; Denny vs Lincoln, 5 Id. 386; Swayze vs. Hull, 3 Hals. Rep. 55.] In Mitchell vs. Smith, [1 Binn. Rep. 118,] it was held that where a statute inflicts a penalty, a prohibition is implied, and a contract relating to the offence is void, although it is not expressly so declared by the act. [Seidenbender vs. Charles, 4 Serg't & R. Rep. 159; Wilson vs. Spencer, 1 Rand. Rep. 76.] It is not necessary that a statute should impose a penalty for doing or omitting to do something, in order to make a contract void which is opposed to its operation; its policy may be violated, though it may contain no prohibitory terms, or be silent as to the consequence of a violation. [Sharp, et al. vs. Teese, 4 Hals. Rep, 352; Tuxberry vs. Miller, 19 Johns. Rep. 311; Myers vs. The State, 1 Conn. Rep. 502.] In Gulick vs. Baily, [5 Hals. Rep. 87,] it was decided, that forbearing to offer proposals to the Post Master General for carrying the mail on a certain route, was not a sufficient consideration to sustain a promise to pay money. That the policy of the act of Congress requiring the Post Master General to invite proposals, by public advertisement, is "to enlarge the number of offers, to increase the competition among persons disposed to contract, and thereby not only to secure to the United States faithful and capable carriers, but to procure the performance of this important public service in the best manner, and upon fair, just and reasonable terms." So, where it was agreed between the plaintiff and defendant, that the latter "should bid off the job" of making a road which "was set up at auction," and divide it with the former—in an action by the plaintiff to recover the value of his interest, it was determined, that the contract was *nudum pactum*, and a fraud on the vendor. [Wilbur vs. How, 8 Johns. Rep. 444.] The common law goes even beyond this, and is so solicitous to maintain its purity and dignity, that it declares invalid any contract which violates the precepts of religion, morality, or the rules of public decency. [Gibson v. Dickie, 3 M. & S. Rep. 463; Binnington v. Wallace, 4 B. & Ald. Rep. 650; Chitty on Con. 4 Am. ed. 513–4–5–6–7–8.] And an illegal contract cannot be enforced, although both parties stand *in pari delicto*. [Roby vs. West, et al. 4 N. Hamp.

Rep. 385; Springfield Bank vs. Merrick, 14 Mass. Rep. 322, and cases cited above.]

The true test by which it is ascertained whether a demand connected with an illegal transaction, is capable of being enforced at law, it is said, is, whether the plaintiff requires the aid of the illegal transaction, to establish his case. [Swan vs. Scott, 11 Serg't & R. Rep. 155; Simpson vs. Bloss, 7 Taunt. Rep. 246.] In Armstrong vs. Toler, [11 Wheat. Rep. 258,] the court say, where a contract grows immediately out of, and is connected with an illegal or immoral act, a court of justice will not lend its aid to enforce it. So if it be connected with the illegal consideration but in part, yet if it grow immediately out of it, though it be in fact a new contract, it is tainted with it.

So strongly disinclined is the law to countenance contracts opposed to sound policy and good morals, that it has been repeatedly held, that no action will lie at the suit of one *particeps criminis* against another, to recover a share of the money received on such a contract. [Belding vs. Pitkin, 2 Caine's Rep. 147, and cases cited in note *a;* Boyd vs. Barclay, 1 Ala. Rep. 34.]

We have thus carefully stated the principles and cited authorities applicable to the question we are considering, not because it was necessary to a decision of the case in hand, but merely to show that the law looks with detestation upon transactions founded in immorality; and to remove, to some extent, the vulgar prejudice against a science, which takes its origin from the *purest fountain of truth.*

Assuming that the witnesses whose testimony is recited in the record are worthy of credit, and making all inferences favorable to the plaintiff, that a jury could make, and it is difficult to conceive of a contract more palpably violative of public policy than that which the court is called on to enforce. The plaintiff, together with two others, is deputed by the State to perform a public trust, and to that end is authorised to enter into a contract to have certain work done at the lowest price ; himself and associates are to supervise the work, and to pay for it, by checking upon the public funds, which were made subject to his order. He enters upon the discharge of the trust, lets out the work; but himself and one of his associates are interested in the contract, to the extent of one eighth each. Here is a striking departure from the line of duty; he had stipulated with the State and pledged

himself to exercise his "disinterested skill, diligence and zeal" for its "exclusive benefit in the business." His interest became adverse to that of the State whenever he assumed the two-fold character of contracting and being contracted with. He was required by the statutes under which he acted, to have the work *well done, and on the best terms;* yet he was interested in having it done in such manner, as was least expensive to the company with which he had associated, and most expensive to the State. His participation in the contract without the assent of the State, was a fraud no doubt, detrimental to its interests. The case itself shows, that so long as cupidity is an attribute of our nature, the State must be a sufferer in transactions with its citizens; unless the sentiment shall become universal, that good morals and justice require the same measure of integrity in public, as in private dealings. The truth of this remark is shown in the present case, by the association which was formed, and their *modus operandi.* Look at the manner in which the bids were made, ranging from $40,000 to near $60,000, with the understanding no doubt, that the lowest bids should be forfeited, and the highest secured.

If the plaintiff had been employed by an individual to perform a similar service, he doubtless never would have thought of being concerned in the contract; yet in such case he would only have abused the confidence, or disappointed the expectations of a single person. But here he was the agent of the entire people in their aggregate political capacity. The same rules apply to contracts with the public, as with individuals; and what would be a fraud or immoral, in the one case, is equally so in the other.— True, in the former, fraud is looked on with more indulgence, than in the latter, and the danger of detection is less. The principles of ethics may not at all times and by all people, be alike understood, yet the basis upon which they rest, know "no variableness, neither shadow of turning."

It is a misfortune the sentiment should be so generally acted on, that it is allowable for all who will, to make the most they can of the State, either by overreaching its officers in a contract, or if more advantageous, tempting them to dishonesty and fraud— that a debt due the State is the last that should be paid—in fact, that it is permissible to avoid it altogether. This feeling is unpatriotic, destructive of virtuous principles, and calculated to bring discredit upon the country.

In the present case, the commissioners who participated in the contract, are not alone in fault; but the other members of the company are censurable for having associated with them; and if the State has been prejudiced by the connection, it may be, if there is no legal, that a moral obligation, at least, rests upon each of them, to repair the injury. But we have seen that the contract between the plaintiff and the company was against policy, whether the public interest suffered or not; and consequently, cannot be enforced. The view taken by the county court, is adverse to that we have expressed.

The judgment is therefore reversed, and the cause remanded.