# Ware *et al. v.* Curry.

## Bill in Equity to Enforce Vendor's Lien on Land.

1. *Misjoinder of defendants to bill; for whom available.*—One who is improperly joined as a defendant to a bill in equity, may take advantage of the misjoinder, but if he fails to appear and object, a demurrer on that ground, by his co-defendants, will not be sustained.

2. *Multifarious; what averments do not render bill multifarious.*—In determining whether or not a bill is multifarious, its object, averments, and prayer, must all be considered; and if it has a single object, to which alone the prayer is directed, it is not rendered multifarious by averments that are impertinent, or which merely seek to negative an anticipated defense.

3. *Contract; test of right to enforce when impeached as illegal.*—When the plaintiff requires the aid of an illegal transaction to support his contract, which is impeached as illegal, it is incapable of enforcement, but if he have rights originating in a transaction not offensive to law, and a right of recovery independent of an illegal transaction, although he may have participated in it, such transaction can not be employed to defeat his suit.

4. *Contract; this test of right to enforce applied in this case.*—A vendor of lands who retained the legal title, but who afterwards voluntarily executed a deed to his vendee, to enable the latter to consummate a contract for the manufacture of iron for the Confederate States, during the war, has a right, springing out of the original contract of sale, to enforce his lien on the lands for the purchase-money.

5. *Statutes of limitation; their operation and effect.*—Statutes of limitation do not annul contracts, or extinguish debts, they only bar such remedies as are specified in them; and where there are several remedies, to which a person seeking to enforce a contract, or collect a debt, may resort, the statute may bar one remedy, without affecting the right to resort to another.

6. *Liens; operation of statutes of limitation on.*—All liens for the payment of debts are in the nature of collateral securities, and may be given without affect-

[Ware et al. v. Curry.]

ing the right of the debtor to rely on the statutes of limitation, as a bar to an action in which a personal judgment would be rendered against him, on the debt, operating on all his property.

7. *Same; same.*—The corresponding principle, that liens are preserved, although the remedy on the debt may be barred by the statute of limitations, prevails both in courts of law, and in courts of equity.

8. *Vendor's lien; may be enforced, although remedy on purchase-money, note barred.*—A vendor of land, whether he retains or has parted with the legal title, may enforce his equitable lien for the unpaid purchase-money, although an action on the note or debt is barred by the statutes of limitation.

9. *Same; how far vendee is protected on bill to enforce.*—When the vendee, in good faith, and without notice of the vendor's lien, has entered into possession of the land, and made valuable improvements thereon, he will be allowed compensation for them, and for partial payments made before notice, and the land will be charged with the lien for the balance of the purchase-money, after deducting such payments, and the value of such improvements.

10. *Same; this rule applied to facts of this case.*—A corporation, having purchased land in good faith, and entered into possession, without notice of the vendor's lien for unpaid purchase-money, and having agreed to pay for it in the shares of its capital stock, will be allowed compensation for valuable improvements, although it has not delivered the stock nor received a deed, but will be compelled to answer to the vendor, for so much of the stock as will correspond to the extent of his lien on the land.

APPEAL from Talladega Chancery Court.

Heard before Hon. N. S. GRAHAM.

This was a bill in equity, filed on the 15th of September, 1878, by Jas. A. Curry, against Horace Ware, Samuel Clabaugh, the Alabama Iron Company, and S. J. Glidden. The bill states, that on the 13th of September, 1862, James A. Curry and Samuel Clabaugh formed a partnership for the purpose of manufacturing iron; that they purchased a large body of lands which are described in the bill, and erected such buildings, and put up such machinery thereon, as was necessary for the manufacture of iron; that the land contained large quantities of iron ore, and that "pig iron" was in great demand; that it was necessary to employ many laborers in the work, and to buy tools, and mules, and oxen, to carry on the business; that on the 11th of October, 1863, complainant, Curry, entered into a contract, by which he sold to Clabaugh his half interest in the iron works, and the property described in the bill, for $100,000, fifty thousand dollars to be paid before the completion of the contract, and fifty thousand dollars to be paid in four equal installments, of $12,500 each; that the assets of the firm should be equally divided, and the debts paid jointly; that Clabaugh executed his notes, one for $50,000 then due, and four others for $12,500 each, due on the first day of April, July, and October, 1864, and on the first day of January, 1865; that the note for $50,000 was taken up about the 18th of December, 1863, and another one given in lieu of it, on that day, for $50,000; that on this note, Clabaugh had paid complainant two mules, at the agreed price of one thousand dollars each, which was

credited thereon December 7, 1864, and that this was all Clabaugh had ever paid complainant on said purchase-money notes. In February, 1864, Clabaugh stated to complainant that it was necessary for him to have a title to the land, to raise money to carry on the business, and to pay the purchase-money; that he hoped to make a contract with the Confederate government for iron, on which he would obtain a large advance, if he could make a satisfactory showing as to his title to the property, and thereby be enabled to pay his note for $50,000, or a large part of it; that thereupon, complainant, on Feb. 12th, 1864, executed a warranty deed to Clabaugh, conveying his half interest in said lands in consideration of one dollar; that the true consideration of this deed was the $100,000 to be paid as above stated; that the hope that Clabaugh could raise money by its execution was merely an inducement to its execution; that complainant retained his purchase-money notes, and Clabaugh retained the contract of Oct. 11th, 1863, which was signed in duplicate; that Clabaugh made no contract with the Confederate government, or any of its agents, and that if he endeavored to make such a contract complainant knew nothing of it, and was in no way a party to it, and that Clabaugh never paid complainant any Confederate money on account of said purchase; that if Clabaugh had made any efforts to obtain a contract to manufacture iron for the Confederate States, or had seen any agent of that government, with that view, at the time said deed was executed, he had carefully concealed the fact from the complainant; that Clabaugh had exclusive possession of the iron works from Oct. 11th, 1863, to April, 1865, "when everything combustible, which could be found about the works, was burned down by the Federal troops, under the command of General Croxton;" that on Jan. 28, 1865, complainant demanded of Clabaugh a rescission of the contract of Oct. 11, 1863, because the latter had never complied with its terms by the payment of even the first note of $50,000, and Clabaugh gave the complainant a written acknowledgment that he had never complied with the contract, and had not paid the first note, and stated in the acknowledgment that the deed was executed to enable him to raise money by completing a contract with the Confederate government; that complainant, with the exception of a very small amount, furnished the money to buy all the land and personal property mentioned in the bill; that complainant had paid about $6,946 of the debts of Clabaugh and Curry, under the terms of the contract of Oct. 11th, 1863, but that said Clabaugh had not paid any of the debts of said firm, except as lumber was shipped to Richey and credited

[Ware et al. v. Curry.]

as is hereafter shown; that complainant had never received any of the assets of said firm; that he would have received payment of said notes in Confederate treasury-notes, which was the only currency in circulation when the contract was made, and when the last note became due; that Clabaugh entered into an arrangement with one Richey, by which they were to take possession of the steam engine at the works, the only available thing left after the burning by Gen. Croxton, and put up a saw mill for the purpose of sawing the pine timber on the lands, and shipping it; that complainant heard of this in January, 1866, and forbade Clabaugh to cut and saw the timber, and the latter then called on him to know how much lumber he would take for his interest in the lands, to which complainant replied, "that he would take six hundred thousand feet, if delivered promptly." Clabaugh refused to give this amount, but some time afterwards Richey proposed to give complainant his (Richey's) obligation for 600,000 feet of lumber, to be delivered within a specified time, for the purchase-money notes made by Clabaugh. Complainant made no contract with Richey to this effect, but, on the latter's stating that he had a contract with Clabaugh to run the mill for twelve months, provided complainant would allow him to do so, and that if he failed to give security on the obligation to deliver the lumber on his purchase of Clabaugh's notes, he would ship lumber on Clabaugh's account as fast as he could, complainant consented that Richey might run the mill under his contract with Clabaugh, but Richey did not send him any written obligation, as he had proposed, but he did ship lumber to complainant, and the latter applied it to the payment of Clabaugh's part of the debts of the firm of Clabaugh & Curry. Complainant also advanced money to Richey to buy food for his laborers, and materials with which to run the mill, so that after deducting this amount from the value of the lumber shipped by him, Richey still owed the complainant a large sum of money. Clabaugh afterwards demanded of complainant his notes, claiming that they had been paid by the delivery of the lumber shipped by Richey. In 1867, Clabaugh being still in possession of the property and engaged in cutting and sawing the timber, retaining the deed of February, 1864, claimed the purchase-money notes, and complainant delivered them to him, as he stated to Clabaugh at the time, not because they had been paid, but because, as complainant thought, the sale had been rescinded by the acknowledgment given him by Clabaugh that the terms of the contract had not been complied with. The bill then states that Horace Ware, a brother-in-law of Clabaugh, held the latter's note for $8,414.12, which

[Ware et al. v. Curry.]

was dated July 1, 1862, and due one day after date ; that on December 13, 1869, Clabaugh and Ware entered into a contract by which the former sold to Ware, "his entire lime, or mill property, being 410 acres of land, &c., and when satisfactory titles are made, said Ware is to give up to said Clabaugh, notes on him to the amount of $15,000 and pay him $8,000 cash ;" that, under this contract, Ware was to have the mill, free of rent, until December, 1869. The bill avers that Ware had full notice that the purchase-money of the land was unpaid, and that Clabaugh was insolvent, though, in truth, the amount of his indebtedness to Ware was not very great ; that complainant had informed Ware, in 1869, that the purchase-money was unpaid ; that both Ware and Clabaugh knew of the existence of liens on the property, and it was agreed between them, that Ware should use so much of the cash payment of $8,000 as would be necessary to buy up these incumbrances, and this Ware did, but complainant was not informed of this secret understanding until July, 1878 ; that Ware held five notes which were all made by Clabaugh during the war, and were, with one exception, payable then. One of these notes shows that it was given for sugar at $4 per pound, another for scrap iron at 50 cents per pound, and another for "20 kettles at $1,412.75 ;" that all of this indebtedness was of this character ; that Ware paid off with the $8,000 cash payment, certain judgments and incumbrances which are set out and described in the bill ; that complainant's interest in the realty sold by him to Clabaugh was worth about $95,000, and his interest in the personal property, was worth about $5,000. The bill then shows that about the 2nd day of November, 1872, Horace Ware entered into a contract, in writing, with the Alabama Iron Company, a domestic corporation, which was signed by Horace Ware, and S. J. Glidden, for himself, and said corporation, by which said Ware bound himself, in consideration of $20,000 of the paid up capital stock in said iron company, to convey to said company by warranty deed the lands described in the bill. The capital stock of the company was fixed at $80,000, and it went into possession of the lands immediately after the contract was made with Ware, and erected a blast furnace for the manufacture of iron, and has made valuable improvements thereon ; that Ware has never conveyed the lands to the company, nor has the company issued to Ware the certificates of its capital stock. The bill disclaims any intention of interfering with any right of the iron company, and avers that Ware had studiously concealed all these facts from its president, Glidden ; that, under the agreement between Ware and the iron company, the lands are represented by the

[Ware et al. v. Curry.]

shares of stock, and Ware is still the owner of the lands, and so far as their liability for the unpaid purchase-money is concerned, the land and said stock are one and the same; that complainant has notified said company, through its president, Glidden, of his lien for the purchase-money, and demanded that the stock should not be issued to Ware. The bill makes Clabaugh, Ware, the Alabama Iron Company, and Glidden, parties defendant, and prays "that a lien may be declared on the lands in favor of complainant to the extent of the value of his half interest in the lands and permanent. improvements thereon, and the fixtures appertaining thereto, and on a half interest in said twenty thousand dollars of paid-up stock."

Clabaugh and Ware appeared and demurred to the bill, on the grounds stated in the opinion of the court, but Glidden did not appear, or put in any demurrer. The Chancellor rendered a decree overruling the demurrer, and this decree is assigned as error.

JOHN T. HEFLIN, for appellants.—The trust that is implied in equity, in favor of the vendor of lands after he has conveyed the legal title, is impressed by law with qualities essentially different from those of the direct trust in favor of the vendor, when he retains the legal title as a security for the purchase-money. The implied trust does not attach to the title, which is in the vendee, nor to the debt; it does not exist as a right until established by decree, and then only as an incident of the debt. The incidents of a debt can not, in equity, survive it and be invoked as a remedy to enforce its payment. This position is sustained in 1 Leading Cas. in Eq. (White & Tudor's notes), Part 1, 483 *et seq.* See, also, *Trotter v. Erwin*, 27 Miss. 772; in *Chapman v. Lee*, 64 Ala. 483; *Bizzell v. Nix*, 60 Ala. 281; *Flinn v. Barber*, 61 Ala. 530, and *Haddock v. Mahone*, 44 Ala. 90; the difference in the rights and remedies of the vendor before and after the conveyance of the legal title is not considered. An examination of the authorities cited in the case of *Chapman v. Lee, supra,* will show that they are not in conflict with the position here assumed by appellants. In none of them was the question raised as to the right of the vendor to enforce his lien, after conveyance of the legal title. The opinion in *Hightower v. Rigsby*, 56 Ala. 126, clearly recognizes the difference in the rights and remedies of the vendor, in the two classes of cases. This decision is in conflict with *Haddock v. Mahone, Bizzell v. Nix, Flinn v. Barber.* and *Chapman v. Lee, supra,* but is in harmony with *Driver v. Hudspeth*, 16 Ala. 348; *Relfe v. Relfe*, 34 Ala. 500; *Shorter v. Frazer*, MSS.; *Bankhead v.*

[Ware et al. v. Curry.]

*Owen,* 60 Ala. 464. The difference between the two classes of cases is determined by the well defined distinction between executed and executory contracts. The lien of the vendor to enforce the payment of the purchase-money, after the conveyance of the legal title, is barred by the same statute of limitations that bars the remedy at law for the collection of the debt. It was so held in *Linthicum v. Tapscott,* 28 Ark. 267; *Robertson v. Wood,* 15 Tex. 1; 27 Miss. 772; 32 Miss. 235; 48 Tex. 634; 7 Yerg. 9; *Harris v. Mills,* 21 Ill. 44; 52 Ill. 53; 61 Ill. 260; *Ib.* 270; 96 Ill. 450. The defense that a claim is stale is allowed when there is a want of reasonable diligence on the part of the complainant, in the commencement of the suit, or in pressing his claims. The averments of the bill, in this case, show that the claim set up by the appellee was stale.

GEO. S. WALDEN, on the same side.—In 1867, Clabaugh openly repudiated the trust and any holding which could be considered subordinate to the claim asserted by the appellee. The statute of limitations began to run against the vendor's lien as soon as this was done, and had effected a bar when the bill was filed.—*Relfe v. Relfe,* 34 Ala. 500; *Bizzell v. Nix,* 60 Ala. 281; *Boyd v. Beck,* 29 Ala. 716; *Byrd v. McDaniel,* 33 Ala. 27; *Shorter v. Frazer,* MSS. Appellee is barred of relief by the unlawful intent with which the conveyance of Feb. 12, 1864, was made.—*Ware v. Jones,* 61 Ala. 288. Appellee is estopped from asserting a lien on the land by the admissions in his bill, and the rules of law applicable to the vendor's lien, do not afford him any remedy against the stock of the Alabama Iron Company, to be issued to Ware, nor is he aided by the delay in issuing the stock, the certificate being only evidence of title.—*Bishop v. Snell,* 37 Ala. 90.

BOWDON & KNOX, for the Alabama Iron Co. and S. J. Glidden.—The bill shows that Clabaugh, and those claiming under him, have had adverse possession of the land for more than ten years, and the lien asserted by appellee is barred by that statute. The contract between Clabaugh and Curry was tainted with illegality, and complainant can not enforce the vendor's lien. The real purpose of the bill was to establish a lien on personal property, i. e. the shares of the capital stock in the Alabama Iron Company to be issued to Ware. This a court of equity can not do.

PARSONS & PARSONS, with whom was TAUL BRADFORD, for appellee.—As Glidden was personally bound on the contract with Ware there was no misjoinder.—*McMaken v. McMaken,*

18 Ala. 576; *Woodward v. Wood*, 19 Ala. 216. The bill is not multifarious, for it does not seek an account of the partnership transactions of Clabaugh and Curry. The averments on that subject were intended to show that the purchase-money had not been paid, by the shipments of lumber by Richey. Curry was not aware when he sold the property to Clabaugh that the latter had been negotiating a contract to manufacture iron for use by the Confederate States in the prosecution of the war against the United States, and what was said some months afterwards can have no influence on the case; at most, it was only an unrealized hope, an unexecuted intention, which human laws do not and can not regulate. While the wrong exists only in thought, there exists a *locus penitentiæ.*—*Smith v. Browley*, 2 Doug. 696 ; *Thomas v. City of Richmond*, 12 Wall. 355 ; *Hananer v. Doane, Ib.* 349. Intention can not by retroaction avoid a lawful contract, which was made months before that intention was expressed. The vendor's intention that an article should be used in aid of the war, must always be connected with its actual use for that purpose, in order to render the contract illegal.—*Ware v. Jones*, 61 Ala. 288; *Milner v. Patton*, 49 Ala. 424 ; *Oxford Iron Co. v. Quinchett*, 44 Ala. 48 ; *Thedford v. McClintock*, 47 Ala. 64 ; *Lockart v. Horn*, 11 Wall. 580. The statute of limitations of ten years does not apply to bar the equity of the appellee to enforce the vendor's lien. The presumption of payment does not arise until twenty years have elapsed from the date of the conveyance, or sale. The equity of the bill is fully sustained by *Driver v. Hudspeth*, 16 Ala. 343 ; *Relfe v. Relfe*, 34 Ala. 500 ; *Mahone v. Haddock*, 44 Ala. 90 ; *Bizzell v. Nix*, 60 Ala. 281 ; *Flinn v. Barber*, 61 Ala. 530 ; *Hightower v. Rigsby*, 56 Ala. 126 ; Story Eq. Jur. 1219. Horace Ware was not a *bona fide* purchaser, for he had not paid the purchase-money of the land before he had notice of the vendor's lien. *Wells v. Morrow*, 28 Ala. 128 ; *Moore v. Clay*, 7 Ala. 747. Nor was the Alabama Iron Company a *bona fide* purchaser without notice. It has not paid any part of the purchase-money, and had full notice of appellee's claim.—*Wells v. Morrow*, 28 Ala. 128. The equity of the special prayer in the bill, to have the shares of the stock subjected to the payment of the purchase-money, was unanimously recognized in *Duffey v. Frenaye*, 5 S. & P. 247.—*Moore v. Clay*, 7 Ala. 742 ; *Reese v. Kirk*, 29 Ala. 410 ; *Frost v. Beekman*, 1 John. Chan. 288 ; 1 Story's Eq. Jur. 27-8.

BRICKELL, C. J.—The original bill is filed by the appellee to enforce a lien on lands for the payment of the purchase-money. There are numerous causes of demurrer

assigned, but they are reducible really to five, which may be stated as follows, viz :

. 1.    That Glidden is without interest in the subject-matter of the suit, and is, therefore, improperly joined as a defendant.

2.    That the bill is multifarious, seeking an account and settlement of the partnership which had existed between the complainant, Curry, and the respondent, Clabaugh, and the enforcement of a lien on the lands for the payment of the individual notes given by Clabaugh to Curry for the purchase-money thereof.

3.    That it is shown by the bill that the contract between Curry and Clabaugh, by which the former conveyed the lands to the latter, was illegal and void.

4.    That the remedy to enforce the lien for the purchase-money of the lands is barred, because an action at law for the recovery of the purchase-money, as well as an action of ejectment for the recovery of the lands, is barred.

5.    That the bill does not seek to subject the lands to the payment of the purchase-money, but the shares of the capital stock of the Alabama Iron Company, which the company had contracted to give Ware in the purchase of the lands.

We shall notice the causes of demurrer, in the order in which they have been stated.

1.    It is unnecessary to consider whether Glidden is not so connected with the contract between Ware and the Alabama Iron Company, for the purchase-money of the lands, that he stands in something more than the relation of a mere agent, contracting for a disclosed principal, and would be consequently a proper, if not a necessary party to the bill.    For, if he stands in the relation of a mere agent, who, within the scope of his authority, has contracted for, and has so contracted as to bind the principal, and is improperly joined as a defendant, the misjoinder is matter available to himself only for his dismissal from the suit, and is not matter of concern to his co-defendants, who can sustain no injury from it.    No rule of equity pleading and practice is better settled, than that misjoinder of defendants, is an objection available only to the defendant improperly joined.—1 Brick. Dig. 753, § 1689.    Glidden not having appeared or demurred, there is no merit in the demurrer of the appellants, his co-defendants, resting upon this ground.

2.    The demurrer for multifariousness is founded in a misconception of the objects, averments, and prayer of the bill. These are all to be considered in determining whether a bill is multifarious.—*Carpenter v. Hall*, 18 Ala. 493.    The bill has a single object, and to that alone is its prayer directed.    The

[Ware et al. v. Curry.]

object is the enforcement of the lien on the lands for the purchase-money unpaid. The averments in reference to the partnership and the partnership transactions, were introduced, doubtless, for no other purpose than to show the relations existing between the complainant and Clabaugh, and to negative the anticipated defense, that payments on the purchase-money had been made by the shipments of lumber Richey made to Curry. Be this as it may, the prayer of the bill is only for the enforcement of the lien claimed on the lands, and these averments in reference to the partnership may be impertinent, but they do not render the bill multifarious.

3. Nor is there any merit in the objection, that the agreement under which Curry made the conveyance of the legal estate in the lands to Clabaugh, was illegal. The deed was made to enable Clabaugh to enter into an arrangement with the agents of the government of the Confederate States for the manufacture of iron, the parties expecting that thereby Clabaugh would be enabled to realize funds to pay the purchase-money. That arrangement was never perfected, and if it had been, it would not have affected the liability of Clabaugh to pay the purchase-money, nor lessened Curry's rights or remedies to enforce its payment. It is not from the agreement, purely voluntary on the part of Curry, by which the deed was executed, that Clabaugh became liable to pay the purchase-money, or that Curry became entitled to receive and demand it. The liability, and the right sprung from the contract of sale made some time prior to the execution of the deed, and not from the subsequent agreement when the deed was executed, Curry claims, and can derive no aid from this subsequent agreement in enforcing the lien a court of equity raises for the payment of the purchase-money. The test by which to ascertain whether a contract impeached as illegal, is capable of enforcement, is whether the plaintiff requires the aid of an illegal transaction to support his case. If he does not—if he has rights originating in a transaction, not offensive to law, and has a right of recovery independent of an illegal transaction, such transaction, though he may have participated in it, can not be employed to defeat him.—*McGehee v. Lindsay*, 6 Ala. 16; *Gunter v. Leckey*, 30 Ala. 591; *Walker v. Gregory*, 36 Ala. 180. This cause of demurrer was properly overruled.

4. The fourth ground of demurrer has been of frequent consideration in this court, and ought to be regarded as settled finally and conclusively, if repeated judicial decisions can put to rest any vexed question, giving peace and security to the community, which ought not to be moved or disturbed.

As to liens operating as a security for the payment of the purchase-money of lands, this court has decided that the lien is preserved, though the statute of limitations has operated a bar to the recovery of the purchase-money as a debt, whether the contract of purchase was executed by a conveyance of the legal estate to the vendee, or was as to a conveyance of the legal estate executory, dependent upon the payment of the purchase-money. Between the two classes of cases, in the operation of this principle, that the lien or security remains, and can be enforced, though remedies for the recovery of the debt may be barred by statutes of limitation, there has been no distinction made, and there is no room or reason for a distinction, though the relation of the parties, and their rights and remedies, are essentially different. *Driver v. Hudspeth*, 16 Ala. 348; *Relfe v. Relfe*, 34 Ala. 500; *Bizzell v. Nix*, 60 Ala. 281; *Shorter v. Frazier*, MSS.; *Chapman v. Lee*, 64 Ala. 483. The difference between these two classes of cases we endeavored to point out and clearly define in *Bizzell v. Nix, supra*, and in *Bankhead v. Owen*, 60 Ala. 457. When the vendor retains in himself the title as a security for the payment of the purchase-money, as was the case in *Driver v. Hudspeth, supra, Relfe v. Relfe, supra*, and in legal effect, though contrary to the intention of the parties in *Shorter v. Frazier, supra*, he has an estate in the lands, and there is no substantial difference in relation, and in rights and remedies, between him and a vendor of lands who conveys to the vendee, and takes a cotemporaneous mortgage to secure the payment of the purchase-money. While a vendor who conveys the legal estate to the vendee, has no interest or estate in the lands, nothing but the lien for the security of the purchase-money, which a court of equity will raise and enforce so long as the debt for the purchase-money remains unpaid. When the reason of the principle now to be applied, is considered, it is obvious that there can not be the slightest difference in its application in these two classes of cases, nor in any case of a lien, a charge upon property for the security of a debt, whether it is express, created by the contract of the parties, or arising by implication of law.

There was formerly much discussion as to the nature, effect, and operation of statutes of limitation upon contracts falling within their influence; whether these statutes were, as in those statutes, borrowed from the statute of 21 James 1, ch. 16, in terms directed more particularly to the forms of action, which must have been pursued to enforce performance of the contract, or, as under our present statute, directed particularly to the character and evidence of the contract. It is now the received doctrine that the contract is not ex-

[Ware et al. v. Curry.]

tinguished, though statutes of limitation operate a bar to remedies for its enforcement. It remains, and of itself, will furnish a sufficient consideration for a new promise to perform it. The new promise is not regarded as a new contract; it operates merely to remove the bar created by the statute; and suits are instituted, not upon the promise, but upon the original contract.—*Childress v. Childress*, 1 Ala. 482; *Jones v. Jones*, 18 Ala. 248. Upon this principle, that statutes of limitation do not annul or extinguish contracts, but relate only to the remedy, rests the doctrine generally prevailing in the absence of a statute otherwise providing, that if the statute of the State in which suit is brought does not operate a bar, the statute of the State in which the contract was made, though it may have perfected a bar while the party sought to be charged was within its jurisdiction, cannot be invoked as a defense.—*Childress v. Childress, supra; Jones v. Jones, supra.* The statutes do not relate to the obligation of the contract, which has its inception in the origin of the contract, but to the remedies which may be pursued when the obligation has been broken. There may be several remedies, to either of which a party can resort when he is damnified by the breach of the contract. The statute may operate to bar the one, without affecting the right to pursue another. All liens for the payment of a debt, are in the nature of collateral securities. Such securities may be given without affecting the right of the debtor to rely on the statute of limitations as a bar to the action on the debt against him personally, in which a personal judgment would be rendered, operating on all his property, whether presently owned or the subject of future acquisition. A common example is, when a mortgage under seal is given as security for the payment of a promissory note, or other simple contract, the note is not taken without the statute—it remains a simple contract, and remedies for its enforcement must be pursued within six years.—Ang. on Lim. § 92; *Scott v. Ware*, 64 Ala. 174. A pawnor giving a pledge for the security of a debt, is not deprived of the benefit of the statute as a protection against an action on the debt.—Ang. on Lim. § 73.

The principle which preserves liens, notwithstanding statutes of limitation operate to bar remedies on the debt, corresponds precisely to the principle that the creation of such liens does not arrest or prevent the operation of the statute as to remedies upon the debt. That principle prevails alike in courts of law and equity. It is quite a mistake to suppose, as is insisted in the argument of appellant's counsel, that it is peculiar to courts of equity. Statutes of limitations operating only on remedies, not on the obligation of

contracts, not working their extinguishment, proceeding on considerations of public policy, independent of the merits of particular cases, for no other remedies than such as are expressed in them. The remedy for a debt may be barred, but there may be no bar to a remedy for the enforcement of a, security or lien, created either by the contract of the parties or by the act of the law. And when there is no such bar, courts of law, as well as courts of equity, enforce the lien or security, when enforcement lies within their jurisdiction, though the remedy for the debt is barred. The lien or security is an incident to the debt, and remains, accompanying the debt, so long as it is not paid.

The case of *Higgins v. Scott*, 2 Barn. & Ad. 413, was the case of a lien of an attorney, enforced by the court of King's Bench, though the debt was barred by the statute of limitations. The case of *Spears v. Hartly*, 3 Esp. 81, before Lord Eldon, while Chief Justice of the Court of Common Pleas, was referred to by counsel. It was an action of trover, brought in 1800, to recover certain merchandise, upon which the defendant, a wharfinger, claimed a lien for a balance of general account due in 1790. As actions for the recovery of this balance was limited to six years, it was contended he could not retain possession of the merchandise for its payment. But Lord Eldon held that as statutes of limitation related only to the remedy, not creating any presumption of the payment of the debt, the wharfinger, by virtue of his lien, could retain the goods until the debt was paid. In Edwards on Factors, § 76, speaking of the lien of factors, which is essentially a *legal*, as distinguishable from an *equitable* lien, the principle, as it prevails in reference to either lien, and in courts of law or of equity, is tersely stated: "The lien remains good, notwithstanding the debt has been barred by the statute of limitations. This is because the statute does not discharge the debt, but only bars the remedy by an action. The rule must be different where the statute is construed as simply raising a presumption of payment from the lapse of time."

The case of *Bank of Metropolis v. Guttschlisk*, 14 Peters, 19, is another instance of the application of the principle in courts of law. Without the knowledge of the bank, a principal debtor had conveyed real estate in trust for the protection and indemnity of his indorser, against whom the bank obtained judgment, but suffered the statute of limitations to bar all remedies for its enforcement. Then being informed of the deed of trust, the bank procured a sale to be made by the trustee, became the purchaser, made a sale of the lands, and the action was against the purchaser for the recovery of

the price.   Of other grounds of defense, it, was insisted the bank did not, under the sale by the trustee, acquire any title, because the statute of limitations having barred it of remedies against the indorser, the trusts of the deed for his protection had expired.   The court answered, that though the statute had operated a bar, the claim was of full force, and protected by the trusts of the deed until it was paid.   In the case of *Waltermire v. Westover*, 4 Kern. (14 N. Y.) 16, the question was very carefully considered in a court of law, and the opinion of Selden, J., is a very clear, full, and precise statement of the principle, and the reasons upon which it is founded.   By the statute of New York, the judgment of a justice of the peace, if a transcript thereof is filed and docketed in the county clerk's office, becomes a lien on the real estate of the defendant.   The statute of limitations bars an action on such judgment in six years from its rendition. It was held, that though an action on the judgment was barred under the latter statute, the lien created by the former statute was preserved and could be enforced until the lapse of time raised a presumption of payment.   The distinction between a statute which discharges the debt, and one affecting only the remedy, is very clearly drawn.   It was said : "If statutes of limitation do not discharge the debt, but act exclusively upon the remedy, upon what principle of interpretation is it to be held, that this statute, which is in terms confined to the remedy by *action*, operates to annihilate the remedy by *execution?*   The statute is in derogation of a clear common law right.   It does not operate according to the recent cases by producing any presumption of payment, but is a mere statutory bar, founded in principles of public policy.   It would be contrary, therefore, to all just rules of construction to extend its operation beyond the fair and reasonable interpretation of its language.   The reasoning which has so fully established that statutes of this sort act upon the remedy only and not upon the debt, equally proves that the operation of the statute in question here is confined to the particular remedy by *action*.   Indeed, the statute could only be held to reach and subvert the remedy by *execution*, by holding that the debt itself is discharged, or by interpolating language not expressly or by any fair implication contained in the statute."—See, also, *Thayer v. Mann*, 19 Pick. 535 ; *Crain v. Pain*, 4 Cush. (Mass.) 483.

It is not insisted that the bill shows there has been any discharge, any payment of the purchase-money of the lands. The whole argument is, that as it is shown the purchase-money was due by simple contract for more than six years, during which there was no legal impediment to a suit at law for its

[Ware et al. v. Curry.]

recovery, the lien cannot be enforced. In other words, that as the statute of limitations operates a bar to an action for the recovery of the purchase-money, the right and remedy to enforce the equitable lien for its payment is also barred. It has not been, and cannot be insisted there is any provision of the statute prescribing the time within which remedies for the enforcement of liens must be pursued in courts of law, or of equity. To apply the statutes to such remedies would require more than an unwarranted interpretation of their terms; there must be an importation into them of causes of action, and of remedies, in reference to which the law-maker was silent. As to remedies for the enforcement of liens for the security of debts, whether the liens are created by the contract of parties, or like the lien of a vendor of lands, who has parted with the legal title, taking no independent security for the payment of the purchase-money, arising by implication of law, there is no statute of limitations. Remedies to enforce them are not barred until twenty years has elapsed, creating a presumption of payment.

It is urged that a different principle ought now to be adopted in courts of equity, as it is expressly declared by statute, that the statutes of limitation shall apply to suits in equity. But the mandate of the statute is fully satisfied, when statutes of limitation have in courts of equity, and in reference to suits in equity, precisely the same operation and effect they have in courts of law in reference to legal remedies. When, if the right was legal, capable of enforcement by a legal remedy, that remedy would not be barred; a corresponding remedy in equity, for the enforcement of a right cognizable only in equity, cannot be barred. We have considered this question much more fully than we would have deemed necessary or proper in view of the former decisions of this court, if it was not so apparent the principle and reason of those decisions was misapprehended and misunderstood. The principle and reason is, that remedies for the enforcement of liens or securities for the payment of a debt, are distinct from and independent of remedies at law or in equity founded on the debt only. The one may be barred by the statute of limitations directed against it, without affecting the remedy for the other, as to which the statute is silent. It is not material whether the right or lien is *legal* or *equitable*, *express* or *implied*. Numerous examples will readily suggest themselves to the professional mind. A mortgagee has three remedies which he may pursue concurrently, or at such intervals as he may elect. The debt may be by simple contract and barred within six years. It would not be supposed, if he suffered this bar to be created, that he was barred of an

[Ware et al. v. Curry.]

action of ejectment limited to ten years ; or, if he suffered that bar to be created, that he was barred of a bill to foreclose, which all authorities agree may be prosecuted until twenty years has raised a presumption of payment of the mortgage debt. An attorney having a lien, has the right to an action at law for the recovery of the debt to which the lien is attached, at any time within three, or within six years, depending on whether the debt is or not an open account. It is matter of choice with him whether he will resort to the action, or rely on the lien ; or he may, if diligent, pursue both. But that he suffers the action barred by the statute of limitations cannot in reason, or in justice, preclude an enforcement of the lien to which the statute does not apply. The equitable lien of a vendor for the payment of the purchase-money of lands, is frailer than that of a mortgagee. The vendor has no estate in the lands, and of course can resort to no remedy for their recovery. He has, however, two remedies ; one by action for the recovery of the purchase-money, another by bill in equity to enforce the lien. Suppose he suffers the action barred by the statute of limitations, the debt is not paid, nor is there a presumption of payment. There is a mere loss, a mere relinquishment of one remedy, which is not an exoneration of the lien, not a discharge of the debt, for without payment of the debt, it is not discharged, nor is the lien exonerated. Pursuit of the lien only, when the debt is barred by the statute, cannot confer a right to a personal judgment if the statute is pleaded. The only judgment or decree which can be rendered is one fixing, establishing and declaring the lien.

It is shown by the bill that the Alabama Iron Company, though purchasing without notice of the lien asserted by Curry, had not paid the purchase-money or received a conveyance of the legal estate. In England, the rule seems to be inflexible, that a purchaser will not be protected against outstanding equities, until he has fully paid the purchase-money and received a conveyance of the legal estate. So long as in either of these particulars the transaction is incomplete, notice of the equity will not only preclude him from proceeding further, but will deprive him of all right to protection for whatever may have been done without notice. The rule generally adopted in the courts of this country is less stringent. The party seeking to fasten a trust, or other equity on the legal estate, is compelled to do equity. If in good faith, without notice of the trust or equity, the purchaser has made partial payments of the purchase-money, or has made improvements enhancing the value of the lands, compensation, indemnity to him, must be approved by the

(19)

[Elliott v. Stocks & Bro.]

party seeking to charge the lands, though a conveyance of the legal estate is not executed, nor the purchase-money fully paid. In the case of *Dufphey v. Frenaye*, 5 St. & Port. 215, this question was very fully considered, and the conclusion was, that in such cases exact justice would be done by fastening a lien on so much of the purchase-money as was unpaid, charging the lands with its payment. The Alabama Iron Company, though it had not delivered to Ware, the shares of its capital stock, contracted to be delivered as the consideration of the sale and conveyance of the lands, and had not received a conveyance of the legal estate, yet had in good faith, without notice of the lien asserted by the complainant, entered into possession and made very extensive and valuable improvements. The purposes of equity and good conscience are met when the rule declared in *Dufphey v. Frenaye, supra,* is applied, and the company is compelled to answer to the complainant for so much of the stock as will correspond to the extent of his lien on the lands. This the bill is framed to accomplish, and its special prayer is addressed to that end.

We have considered the several causes of demurrer, and do not find any one of them well taken. The decree of the Chancellor must of consequence be affirmed.